1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7   HALCYON HORIZONS,                       Case No.17-cv-00756-JST
    INCORPORATED,
8                                           **ORDER DENYING MOTION FOR**
                Plaintiff,                  **PRELIMINARY INJUNCTION AND**
9                                           **DISMISSING CASE WITHOUT**
         v.                                 **PREJUDICE**
10
    DELPHI BEHAVIORAL HEALTH                Re: ECF No. 5
11  GROUP, LLC, et al.,

12              Defendants.

13

14        Before the Court is Plaintiff Halcyon Horizon, Inc., d/b/a Elevate Addiction Services'

15  ("Elevate") motion for preliminary injunction.  The Court will deny the motion and dismiss the

16  case without prejudice for lack of standing.[1]

17  **I.     BACKGROUND**

18        Elevate is a California company that operates addiction recovery centers.  Specifically,

19  Elevate is a "licensed, certified and accredited detoxification, residential and outpatient facility."

20  ECF No. 5 at 7; Nos. 5-5, 5-6.  In September and November 2015, respectively, Elevate CEO and

21  Chairman of the Board Daniel Manson filed applications for the "ELEVATE ADDICTION

22  SERVICES" word mark and a related figurative mark.  ECF Nos. 5-2 (word mark), 5-3 (figurative

23  mark) (collectively, the "ELEVATE Marks").  Manson filed the applications as an individual, but

24  now states that "[he] made that filing in [his] capacity as the President and Chairman of the Board

25  for Halcyon Horizons, Incorporated, for use by the company."  ECF No 23 ¶ 5.  Elevate claims to

26  have used the ELEVATE Marks "in connection with addition recovery services since that date."

27  _____

28  [1] The Court finds the motion suitable for disposition without oral argument and VACATES the
    hearing set for April 4, 2017.  Civ. L.R. 7-1(b).

United States District Court
Northern District of California

1    The Elevate Marks were registered in early 2016.  Id.

2         On October 12, 2016, Manson and Halcyon entered into an Exclusive Trademark License

3    Agreement.  ECF No. 5-4.  Under the licensing agreement, Manson "retains the right . . . to

4    monitor the quality of the Services" provided using the ELEVATE Marks.  Id. (Section 2(b)).

5    Moreover, "[a]ll use of any Trademarks licensed by this Agreement and used in connection with

6    any Services shall inure to the benefit of [Manson]." Id. (Section 2(d)).  With respect to

7    enforcement and protection of the marks, the licensing agreement provides that "Licensee shall

8    have the right, at its own expense to prosecute actions against infringers and defend against

9    infringement actions, subject to the prior written approval of the Licensor."  Id. (Section 3(b)).

10   Manson also retains the option to "prosecute such actions independently" if he believes the marks

11   are being infringed and Elevate declines to file suit.  Id.

12        Elevate asserts that it has "established itself as a trusted and respected addiction recovery

13   center, and has spent substantial resources establishing its brand under the ELEVATE Marks."

14   ECF No. 5 at 8.  For example, Elevate obtained a license from the State of California's

15   Department of Health Care Services to provide "individual sessions; recovery or treatment

16   planning; group sessions; educational sessions and detoxification."  ECF No. 5-6.  Elevate is also

17   accredited by the Joint Commission as a Behavioral Health Care Program.  ECF Nos. 5-7, 5-8, 5-

18   10.[2]  The California Consortium of Addiction Program and Professionals recognized Elevate as a

19   "Program of Distinction."  ECF No. 5-10.  Each of these licenses, accreditations, and awards

20   occurred under the Elevate Addiction Services name.

21        Elevate claims to have received positive reviews on various websites where customers can

22   post comments.  One person wrote, for example, "[t]his facility is your best chance if you have an

23   addiction problem."  ECF No. 5-11 (screen shots of comments).  Another stated, "Elevate saved

24   my family, I would recommend it to anyone and everyone who is in need of treatment."  Id.  Also

25   to promote its brand, Elevate "participates in a number of community events," including co-

26   hosting a sober grad night and sponsoring local women's shelters, all using the Elevate Marks.

27

28   _____
     [2] "The Joint Commission is an independent, not-for-profit national body that oversees the safety
     and quality of health care and other services provided in accredited organizations.  ECF No. 5-7.

ECF No. 23 at 3.  Finally, Elevate has spent money "advertising, branding and marketing the Elevate Addiction Services name."  ECF No. 5 at 10.  For example, Elevate spent several hundred thousand dollars on direct marketing, and several hundred thousand more for website branding and marketing, website maintenance and promotion, and television commercial advertising.  ECF No. 23 at 3; see also ECF Nos. 23-1-23-5 (exhibits to Manson declaration).

Defendant Delphi Behavioral Health Group, LLC, also operates addiction recovery centers, one of which it calls "Elevate Recovery Center."  ECF No. 5 at 10.[3]  Like Elevate's facilities, the Elevate Recovery Center is located in California.  Elevate Recovery Center registered to do business in California with the Secretary of State on November 24, 2014.  ECF No. 27-1 ¶ 4, signed a lease with a May 15, 2015 effective date, id. ¶¶ 6, 8, employed over a dozen staff since June 2015, id. ¶¶ 5, 14, and claims to have served over 50 patients between June 2015 and September 23, 2015, id. ¶ 16.  According to both parties' websites, the facilities offer similar categories of service.  ECF No. 5 at 11.

Despite these similarities, Elevate claims that compared with its own clinics, the Elevate Recovery Center has poor treatment services and bad business practices.  Elevate Recovery Center is not licensed by the State of California to provide "detoxification or residential addiction treatment services," despite advertising them on its website.  ECF No. 5-13.  Elevate also claims to have identified unfavorable reviews of Defendants' center on Facebook.  ECF No. 5 at 11.

Elevate claims that Defendants' use of the "Elevate" name has created confusion among its customers because both companies advertise similar services and operate facilities in California. Id. at 11.   For example, consumers have called Elevate to complain about the poor business practices at Elevate Recovery Center, not realizing that Elevate Recovery Center is operated by Defendants, not Plaintiff.  ECF No. 5-1 at 3.

Seeking to prevent further confusion, Elevate contacted Defendants to inform them of their "infringement of the registered service mark–ELEVATE Addiction Services" and to demand that

---

[3]  Elevate states that "[o]n information and belief, 'Elevate Recovery Center' is operated by Defendant Elevate Recovery LLC," which is subsidiary of Defendant Delphi.  ECF No. 5 at 7 n.1. For purposes of this motion, the Court refers to Delphi and Elevate Recovery jointly as "Defendants."

United States District Court
Northern District of California

Defendants "cease and desist from using Elevate Recovery in public branding or promotion."
ECF No. 5-15.  In spite of this warning, Defendants have continued to operate the Elevate
Recovery Center under that name.  ECF No. 5-1 at 4.  Instead, Defendant Elevate Recovery LLC
filed an application for trademark registration of the mark "ELEVATE" for "[a]ddiction treatment
services, rehabilitation of drug, alcohol and narcotic addicted patients."  ECF No. 5-14 at 3.  On
December 28, 2016, the United States Patent and Trademark Office ("USPTO") refused
registration of Defendants' applied-for mark based on a likelihood of confusion with Plaintiff's
ELEVATE Marks.  Id.

On February 17, 2017, Elevate filed suit against Defendants alleging trademark
infringement of the ELEVATE Marks under the Lanham Act, 15 U.S.C. § 1114, unfair
competition in violation of California Business Code § 17200, and cybersquatting in violation of
15 U.S.C. § 1125.  Then, on February 21, 2017, Elevate filed the present motion for preliminary
injunction to stop Defendants "from further use of the 'Elevate Recovery Center' name, and all
similarly confusing names, in connection with its addiction recovery centers."  ECF No. 5 at 6.

## II.    LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on
the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the
balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v.
Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008).  Courts use different
formulations to describe the first factor, including "reasonable probability," "fair prospect,"
"substantial case on the merits," and "serious legal questions . . . raised."  Lair v. Bullock, 697
F.3d 1200, 1204 (9th Cir.2012). These formulations "are largely interchangeable," and "indicate
that, 'at a minimum,' a petitioner must show that there is a 'substantial case for relief on the
merits.'"  Id. (quoting Leiva–Perez v. Holder, 640 F.3d 962, 968 (9th Cir. 2011).  "The standard
does not require the petitioners to show that 'it is more likely than not that they will win on the
merits.'"  Id. (quoting Leiva–Perez, 640 F.3d at 966).  "[S]erious questions going to the merits
and a balance of hardships that tips sharply towards the plaintiff can support issuance of a
preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable

United States District Court
Northern District of California

4

injury and that the injunction is in the public interest." <u>Alliance for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).  A preliminary injunction is an extraordinary remedy never awarded as of right." <u>Winter</u>, 555 U.S. at 24.

## III.    ANALYSIS

### A.    Validity of the ELEVATE Marks

Before responding to the merits of the preliminary injunction motion, Defendants claim that the ELEVATE Marks are void *ab initio*.  ECF No. 27 at 14-18.  This argument fails. Defendants assert that the owner of the ELEVATE Marks was not properly listed on the trademark applications.  <u>Id.</u>   They claim that Plaintiff, not Manson, should have been named as the owner of the two trademarks, because only Plaintiff had the intent to use the ELEVATE Marks.  <u>Id.</u>

As Elevate explains, however, Manson properly filed the applications based on "use of the mark solely by a related company whose use inures to the applicant's benefit."  TMEP 1201.01.[4] As the Manual explains,

> The essence of related-company use is the control exercised over the nature and quality of the goods or services on or in connection with which the mark is used. When a mark is used by a related company, use of the mark inures to the benefit of the party who controls the nature and quality of the goods or services. This party is the owner of the mark and, therefore, the only party who may apply to register the mark.

<u>Id.</u>  Here, Manson retains control over the ELEVATE Marks through the licensing agreement. ECF No. 5-4.  The licensing agreement also expressly states that "[a]ll use of any Trademarks licensed by this Agreement and used in connection with any Services shall inure to the benefit of the Licensor."  <u>Id.</u>  Therefore, Manson properly applied to register the ELEVATE Marks for use by a related company.[5]

Defendants' argument that the planned use by the related company must be disclosed in

---

[4] The parties agree that the Trademark Manual of Examining Procedure ("TMEP") governs the application for trademark registrations.

[5] Nor were the ELEVATE Marks void because Manson is the CEO of a non-profit, rather than for-profit entity.  <u>See</u> <u>Estate of Coll-Monge v. Inner Peace Movement</u>, 524 F.3d 1341, 1347 (D.C. Cir. 2008) ("We conclude the court erred in holding that a non-profit corporation cannot be a related company whose use of the trademark is controlled by a mark's registrant.")

United States District Court
Northern District of California

the application is outdated.  As Elevate points out, although that requirement was a part of

TMEP's 2008 edition, it was later removed.  Both the version in use at the time Manson applied to

register the ELEVATE Marks and the current version include the following language:

> The USPTO does not require an application to specify if the applied-for mark is not being used by the applicant but is being used by one or more related companies whose use inures to the benefit of the applicant under §5 of the Act. Moreover, where the application states that use of the mark is by a related company or companies, the USPTO does not require an explanation of how the applicant controls the use of the mark.

TMEP 1201.03(a) (2017 ed.).  The ELEVATE Marks were therefore not void *ab initio*.

### B.      Lanham Act Standing

Next, Defendants claim that Elevate lacks standing to assert its trademark claims.  ECF

No. 27 at 18.  This is a closer question.

Although the Ninth Circuit has yet to address the question, most district courts in this

circuit have concluded that an exclusive licensee of a federal trademark *can* have standing to sue

for trademark infringement under Section 32 of the Lanham Act.[6]  That said, even the courts

taking this more lenient approach have stated that standing can only "exist where the licensing

agreement both grants an exclusive license and grants to the exclusive licensee a property interest

in the trademark, or rights that amount to those of an assignee."  Innovation Ventures, LLC v.

Pittsburg Wholesale Grocers, Inc., No. C 12-05523 WHA, 2013 WL 1007666, at *6 (N.D. Cal.

Mar. 13, 2013), at *26 (N.D. Cal. Mar. 11, 2013) (quoting Visa U.S.A., Inc. v. First Data Corp.,

No. C 02-01786, 2005 WL 6271242, at *3 (N.D. Cal. Aug. 16, 2005)).

In Innovation Ventures, another court in this district concluded that it was a "close call"

whether the licensing agreement granted "'all' significant rights" to the licensee, Innovation

Ventures.  Id. at *6.  First, the Court noted that the licensor, International IP, retained "the right to

inspect Innovation Ventures' use of the marks in order to maintain quality control," but gave that

fact little weight because "[t]his type of supervision clause . . . is required feature of any valid

trademark license."  Id. at *5.  Second, the court explained that "International IP also retained a

---

[6] Courts in other jurisdictions have strictly construed the statute as applying to only to owners of federal trademarks.  E.g., DEP Corp. v. Interstate Cigar Co., Inc., 622 F.2d 621, 622–23 (2d Cir. 1980).

United States District Court
Northern District of California

1  slice of control over litigation . . . because the agreement states that Innovation Ventures 'may not

2  settle [a] lawsuit/proceeding if the settlement includes admissions of patent invalidity or other

3  matters that adversely affect the viability of any of the Intellectual Property unless previously

4  agreed to by the Parties.'"  Id.   But the court described this limitation as a "narrow" one, that did

5  "not, as a practical matter, alter Innovation Ventures' status as the party that controls the

6  exploitation of the intellectual property."  Id. at 6.  Finally, the court found that "[t]he structure of

7  the transaction executed between International IP and Innovation Ventures is also significant,"

8  because "the validity of assignments and reciprocal license grant-backs is well-established."  Id.

9  Overall, "[t]he rights retained by International IP were few."  Id.  Given those facts, the court

10  refused to resolve standing on a Rule 12 motion, reserving for trial "questions regarding how

11  plaintiffs contractual arrangement has operated in practice, the extent of the control actually

12  exercised by the licensor, and the intent of the parties at the time of the assignment and license-

13  back transaction."  Id.

14       Lasco Fittings, Inc. v. Lesso America, Inc., No. CV-1302015, 2014 WL 12601016 (C.D.

15  Cal. Feb. 21, 2014), provides another example of this analysis.  The Lasco court contrasted the

16  licensing agreement before it with the one in Innovation Ventures and concluded it was "more

17  limited in scope."  Id. at *4.  First, the court explained that the "License is only for certain types of

18  products and not for the trademark in its entirety."  Id.  Second, "the license contains clauses

19  explicitly stating that the licensor retains title and ownership of the mark and all rights not

20  expressly granted in the exclusive license."  Id.  Third, "the licensor retains control over the

21  nature and quality of the products sold by LASCO using the mark, a requirement that is not

22  consistent with an assignment."  Id.  And forth, "although the License gives LASCO the right to

23  sue to enforce the mark for certain products covered under the License, LASCO must notify the

24  licensor and may not enforce the trademark in relation to other products."  Id.  The court also

25  noted that "[u]nlike in Innovation Ventures, the License [was] not an assignment and license-back

26  agreement."  Id.  The "structure of the License agreement [therefore] [did] not suggest the parties

27  intended the exclusive License to be equivalent to an assignment."  Id.  Based on these facts, the

28  court dismissed LASCO's trademark infringement claims for lack of standing.  Id. at *5.

United States District Court
Northern District of California

This case falls somewhere between <u>LASCO</u> and <u>Innovation Ventures</u>.[7]  Weighing in favor of standing, the license allows Elevate to use the ELEVATE Marks "in connection with providing addiction treatment and rehabilitation services for alcohol and substance-addicted individuals." ECF No. 5-4.  This, for all practical purposes, is a license for the trademarks in their entirety, not for "only certain types of [services]."  <u>Lasco</u>, 2014 WL 12601016, at *4.  Also pointing toward standing is the fact that the agreement contains no clause "explicitly stating that the licensor retains title and ownership of the mark and all rights not expressly granted in the exclusive license."  <u>Id.</u>  On the other hand, Manson retains even greater control over the litigation than did the licensor in <u>Innovation Ventures</u>.  There, as here, the agreement contained a provision requiring licensor approval of settlements that affect the trademarks.  2013 WL 1007666, at *6.  But Manson's licensing agreement *also* requires his approval to "prosecute actions against infringers and defendant against infringement actions." ECF No. 5-4 (Section 3(b)).  And while Elevate can decide affirmatively to bring litigation, it cannot decide that such litigation will not be brought; if it declines to bring suit, Manson may then do so.  <u>Id.</u>  These latter two provisions constitute more than just "a slice of control over litigation."  2013 WL 1007666, at *6.  Finally, unlike in <u>Innovation Ventures</u>, Manson and Elevate did not enter into an assignment and license-back agreement, which the <u>Lasco</u> court found weighed against standing.

Nor does <u>Spin Master, LTD v. Zobmondo Entertainment, LLC</u>, No. CV 06-3459 ABC, 2011 U.S. Dist. LEXIS 94905 (C.D. Cal. Aug. 22, 2011), help Elevate's case.  Elevate claims that in <u>Spin Master</u>, the licensor retained "sole discretion" over litigation decisions, and yet the court still found that the licensee had standing to enforce trademark rights.  ECF No. 32 at 11 (quoting <u>Spin Master</u>, 2011 U.S. Dist. LEXIS 94905, at *22-23).  Elevate gets its facts wrong.  It was Spin Master, the *licensee*, who had "'sole discretion' to decide . . . whether to litigate, settle, or otherwise resolve the lawsuit."  <u>Spin Master</u>, 2011 U.S. Dist. LEXIS 94905, at *22-23.  By contrast here, Elevate had to obtain Manson's written approval for all litigation decisions, and

---

[7] As an initial matter, there is no dispute that the licensing agreement gives Manson control over the quality of the services associated with the ELEVATE Marks, but the Court agrees with the reasoning in <u>Innovate Ventures</u> that this fact is not particularly helpful.  This type of supervision clause is a required feature of any valid trademark license.  <u>Innovation Ventures</u>, 2013 WL 1007666, at *5.

United States District Court
Northern District of California

1

2

Manson could decide to bring suit even when Elevate would not.  Given the factual dissimilarities, the fact that standing existed in <u>Spin Master</u> in no way supports Elevate's standing argument here.

3

4

5

6

7

8

9

10

11

12

There is no question that the licensing agreement between Manson and Elevate grants Elevate an exclusive license to the ELEVATE Marks.  ECF No. 5-4 (Section 1).  Based on the text of the licensing agreement, however, the Court cannot conclude that it "grants to the exclusive licensee a property interest in the trademark, or rights that amount to those of an assignee." <u>Innovation Ventures</u>, 2013 U.S. Dist. LEXIS 34937, at *26 (quoting <u>Visa</u>, 2005 WL 6271242, at *3).  Most importantly, Manson retains too much control over Elevate's litigation decisions through the licensing agreement's written approval requirement.  If the agreement were the assignment and license-back variety, the Court might have concluded, like in <u>Innovation Ventures</u>, that sufficient factual disputes remained about standing to proceed to trial.  But here, the Court concludes as a matter of law that Elevate lacks standing to bring trademark infringement claims over the ELEVATE Marks.[8]

13

14

### C.     UCL Standing

15

16

17

18

19

20

21

22

23

24

Elevate also moves for a preliminary injunction based on a UCL violation.  To the extent the UCL claim is predicated on its trademark infringement claim, that claim fails.  Elevate separately argues, however, that Defendants violated the UCL by "offering recovery services without a license as required by under California law."  ECF No. 5 at 17.  But as Defendants point out, Elevate does not explain how that practice, even if true, has harmed Elevate separate and apart from the alleged trademark infringement.  Without a showing of injury in fact, Elevate lacks standing to pursue its UCL claim as well.  <u>Hall v. Time Inc.</u>, 158 Cal. App. 4th 847, 854 (2008) (explaining that "a plaintiff suffers an injury in fact for purposes of standing under the UCL when he or she has: (1) expended money due to the defendant's acts of unfair competition; (2) lost money or property; or (3) been denied money to which he or she has a cognizable claim.") (internal citations omitted).

25

### CONCLUSION

26

The Court denies Elevate's motion for preliminary approval.  Although Defendants'

27

28

---

[8] The Court does not reach the arguments about prior use or the merits of Elevate's trademark claim.

1  motion to dismiss, ECF No. 28, is not fully briefed, the Court dismisses Plaintiff's Lanham Act

2  and UCL claims without prejudice for lack of standing based on the analysis above.[9]  The Court

3  grants Elevate leave to amend its complaint to allege additional facts that might show that

4  Elevate's exclusive license amounted to an assignment or that Elevate suffered an injury in fact

5  from Defendants' failure to obtain a license.  To the extent Elevate re-pleads its UCL claim, the

6  Court also suggests that Elevate explain more clearly which prong of the UCL it claims has been

7  violated.  Any amended complaint must be filed on or before April 18, 2017.

8       IT IS SO ORDERED.

9  Dated: March 30, 2017

10      JON S. TIGAR

    United States District Judge

---

[9] The Court does not address Plaintiff's cybersquatting claim, which was not raised in the motion for preliminary injunction.