UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HALCYON HORIZONS, INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>DELPHI BEHAVIORAL HEALTH GROUP, LLC, et al.,<br><br>Defendants. | Case No.17-cv-00756-JST<br><br>**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION AND DISMISSING CASE**<br><br>Re: ECF No. 5 |

Before the Court is Plaintiff Halcyon Horizon, Inc., d/b/a Elevate Addiction Services' ("Elevate") motion for preliminary injunction. The Court will deny the motion and dismiss the case for lack of standing.[1]

## I. BACKGROUND

Elevate is a California company that operates addiction recovery centers. Specifically, Elevate is a "licensed, certified and accredited detoxification, residential and outpatient facility." ECF No. 5 at 7; Nos. 5-5, 5-6. In September and November 2015, respectively, Elevate CEO and Chairman of the Board Daniel Manson filed applications for the "ELEVATE ADDICTION SERVICES" word mark and a related figurative mark. ECF Nos. 5-2 (word mark), 5-3 (figurative mark) (collectively, the "ELEVATE Marks"). Manson filed the applications as an individual, but

---

[1] On April 14, 2017, the Court ordered Plaintiff to file a brief explaining why the Court should not amend its March 30, 2017 Order, ECF No. 33, to eliminate the discussion of the validity of the ELEVATE Marks given that the Court's standing determination was sufficient to resolve the then-pending motions for preliminary injunction and to dismiss. ECF No. 39. Plaintiff's brief does not demonstrate that the Court's validity findings were necessary to its decision to dismiss the case. Therefore, the Court now re-issues its Order to eliminate that discussion. This Order replaces the March 30, 2017 Order.

now states that "[he] made that filing in [his] capacity as the President and Chairman of the Board for Halcyon Horizons, Incorporated, for use by the company." ECF No 23 ¶ 5. Elevate claims to have used the ELEVATE Marks "in connection with addition recovery services since that date." The Elevate Marks were registered in early 2016. Id.

On October 12, 2016, Manson and Halcyon entered into an Exclusive Trademark License Agreement. ECF No. 5-4. Under the licensing agreement, Manson "retains the right . . . to monitor the quality of the Services" provided using the ELEVATE Marks. Id. (Section 2(b)). Moreover, "[a]ll use of any Trademarks licensed by this Agreement and used in connection with any Services shall inure to the benefit of [Manson]." Id. (Section 2(d)). With respect to enforcement and protection of the marks, the licensing agreement provides that "Licensee shall have the right, at its own expense to prosecute actions against infringers and defend against infringement actions, subject to the prior written approval of the Licensor." Id. (Section 3(b)). Manson also retains the option to "prosecute such actions independently" if he believes the marks are being infringed and Elevate declines to file suit. Id.

Elevate asserts that it has "established itself as a trusted and respected addiction recovery center, and has spent substantial resources establishing its brand under the ELEVATE Marks." ECF No. 5 at 8. For example, Elevate obtained a license from the State of California's Department of Health Care Services to provide "individual sessions; recovery or treatment planning; group sessions; educational sessions and detoxification." ECF No. 5-6. Elevate is also accredited by the Joint Commission as a Behavioral Health Care Program. ECF Nos. 5-7, 5-8, 5-10.[2] The California Consortium of Addiction Program and Professionals recognized Elevate as a "Program of Distinction." ECF No. 5-10. Each of these licenses, accreditations, and awards occurred under the Elevate Addiction Services name.

Elevate claims to have received positive reviews on various websites where customers can post comments. One person wrote, for example, "[t]his facility is your best chance if you have an addiction problem." ECF No. 5-11 (screen shots of comments). Another stated, "Elevate saved

---

[2] "The Joint Commission is an independent, not-for-profit national body that oversees the safety and quality of health care and other services provided in accredited organizations. ECF No. 5-7.

2

my family, I would recommend it to anyone and everyone who is in need of treatment." Id. Also to promote its brand, Elevate "participates in a number of community events," including co-hosting a sober grad night and sponsoring local women's shelters, all using the Elevate Marks. ECF No. 23 at 3. Finally, Elevate has spent money "advertising, branding and marketing the Elevate Addiction Services name." ECF No. 5 at 10. For example, Elevate spent several hundred thousand dollars on direct marketing, and several hundred thousand more for website branding and marketing, website maintenance and promotion, and television commercial advertising. ECF No. 23 at 3; see also ECF Nos. 23-1-23-5 (exhibits to Manson declaration).

Defendant Delphi Behavioral Health Group, LLC, also operates addiction recovery centers, one of which it calls "Elevate Recovery Center." ECF No. 5 at 10.[3] Like Elevate's facilities, the Elevate Recovery Center is located in California. Elevate Recovery Center registered to do business in California with the Secretary of State on November 24, 2014. ECF No. 27-1 ¶ 4, signed a lease with a May 15, 2015 effective date, id. ¶¶ 6, 8, employed over a dozen staff since June 2015, id. ¶¶ 5, 14, and claims to have served over 50 patients between June 2015 and September 23, 2015, id. ¶ 16. According to both parties' websites, the facilities offer similar categories of service. ECF No. 5 at 11.

Despite these similarities, Elevate claims that compared with its own clinics, the Elevate Recovery Center has poor treatment services and bad business practices. Elevate Recovery Center is not licensed by the State of California to provide "detoxification or residential addiction treatment services," despite advertising them on its website. ECF No. 5-13. Elevate also claims to have identified unfavorable reviews of Defendants' center on Facebook. ECF No. 5 at 11.

Elevate claims that Defendants' use of the "Elevate" name has created confusion among its customers because both companies advertise similar services and operate facilities in California. Id. at 11. For example, consumers have called Elevate to complain about the poor business practices at Elevate Recovery Center, not realizing that Elevate Recovery Center is operated by

---

[3] Elevate states that "[o]n information and belief, 'Elevate Recovery Center' is operated by Defendant Elevate Recovery LLC," which is subsidiary of Defendant Delphi. ECF No. 5 at 7 n.1. For purposes of this motion, the Court refers to Delphi and Elevate Recovery jointly as "Defendants."

3

1  Defendants, not Plaintiff. ECF No. 5-1 at 3.

2  Seeking to prevent further confusion, Elevate contacted Defendants to inform them of their "infringement of the registered service mark–ELEVATE Addiction Services" and to demand that Defendants "cease and desist from using Elevate Recovery in public branding or promotion." ECF No. 5-15. In spite of this warning, Defendants have continued to operate the Elevate Recovery Center under that name. ECF No. 5-1 at 4. Instead, Defendant Elevate Recovery LLC filed an application for trademark registration of the mark "ELEVATE" for "[a]ddiction treatment services, rehabilitation of drug, alcohol and narcotic addicted patients." ECF No. 5-14 at 3. On December 28, 2016, the United States Patent and Trademark Office ("USPTO") refused registration of Defendants' applied-for mark based on a likelihood of confusion with Plaintiff's ELEVATE Marks. Id.

On February 17, 2017, Elevate filed suit against Defendants alleging trademark infringement of the ELEVATE Marks under the Lanham Act, 15 U.S.C. § 1114, unfair competition in violation of California Business Code § 17200, and cybersquatting in violation of 15 U.S.C. § 1125. Then, on February 21, 2017, Elevate filed the present motion for preliminary injunction to stop Defendants "from further use of the 'Elevate Recovery Center' name, and all similarly confusing names, in connection with its addiction recovery centers." ECF No. 5 at 6.

## II. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008). Courts use different formulations to describe the first factor, including "reasonable probability," "fair prospect," "substantial case on the merits," and "serious legal questions . . . raised." Lair v. Bullock, 697 F.3d 1200, 1204 (9th Cir.2012). These formulations "are largely interchangeable," and "indicate that, 'at a minimum,' a petitioner must show that there is a 'substantial case for relief on the merits.'" Id. (quoting Leiva–Perez v. Holder, 640 F.3d 962, 968 (9th Cir. 2011). "The standard does not require the petitioners to show that 'it is more likely than not that they will win on the

4

merits.'" Id. (quoting Leiva–Perez, 640 F.3d at 966). "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted). A preliminary injunction is an extraordinary remedy never awarded as of right." Winter, 555 U.S. at 24.

**III.    ANALYSIS**

    **A.    Lanham Act Standing**

Defendants claim that Elevate lacks standing to assert its trademark claims. ECF No. 27 at 18. Although the Ninth Circuit has yet to address the question, most district courts in this circuit have concluded that an exclusive licensee of a federal trademark *can* have standing to sue for trademark infringement under Section 32 of the Lanham Act.[4] That said, even the courts taking this more lenient approach have stated that standing can only "exist where the licensing agreement both grants an exclusive license and grants to the exclusive licensee a property interest in the trademark, or rights that amount to those of an assignee." Innovation Ventures, LLC v. Pittsburg Wholesale Grocers, Inc., No. C 12-05523 WHA, 2013 WL 1007666, at *6 (N.D. Cal. Mar. 13, 2013), at *26 (N.D. Cal. Mar. 11, 2013) (quoting Visa U.S.A., Inc. v. First Data Corp., No. C 02-01786, 2005 WL 6271242, at *3 (N.D. Cal. Aug. 16, 2005)).

In Innovation Ventures, another court in this district concluded that it was a "close call" whether the licensing agreement granted "'all' significant rights" to the licensee, Innovation Ventures. Id. at *6. First, the Court noted that the licensor, International IP, retained "the right to inspect Innovation Ventures' use of the marks in order to maintain quality control," but gave that fact little weight because "[t]his type of supervision clause . . . is a required feature of any valid trademark license." Id. at *5. Second, the court explained that "International IP also retained a slice of control over litigation . . . because the agreement states that Innovation Ventures 'may not

---

[4] Courts in other jurisdictions have strictly construed the statute as applying to only to owners of federal trademarks. E.g., DEP Corp. v. Interstate Cigar Co., Inc., 622 F.2d 621, 622–23 (2d Cir. 1980).

settle [a] lawsuit/proceeding if the settlement includes admissions of patent invalidity or other matters that adversely affect the viability of any of the Intellectual Property unless previously agreed to by the Parties.'" Id. But the court described this limitation as a "narrow" one, that did "not, as a practical matter, alter Innovation Ventures' status as the party that controls the exploitation of the intellectual property." Id. at 6. Finally, the court found that "[t]he structure of the transaction executed between International IP and Innovation Ventures is also significant," because "the validity of assignments and reciprocal license grant-backs is well-established." Id. Overall, "[t]he rights retained by International IP were few." Id. Given those facts, the court refused to resolve standing on a Rule 12 motion, reserving for trial "questions regarding how plaintiffs contractual arrangement has operated in practice, the extent of the control actually exercised by the licensor, and the intent of the parties at the time of the assignment and license-back transaction." Id.

Lasco Fittings, Inc. v. Lesso America, Inc., No. CV-1302015, 2014 WL 12601016 (C.D. Cal. Feb. 21, 2014), provides another example of this analysis. The Lasco court contrasted the licensing agreement before it with the one in Innovation Ventures and concluded it was "more limited in scope." Id. at *4. First, the court explained that the "License is only for certain types of products and not for the trademark in its entirety." Id. Second, "the license contains clauses explicitly stating that the licensor retains title and ownership of the mark and all rights not expressly granted in the exclusive license." Id. Third, "the licensor retains control over the nature and quality of the products sold by LASCO using the mark, a requirement that is not consistent with an assignment." Id. And forth, "although the License gives LASCO the right to sue to enforce the mark for certain products covered under the License, LASCO must notify the licensor and may not enforce the trademark in relation to other products." Id. The court also noted that "[u]nlike in Innovation Ventures, the License [was] not an assignment and license-back agreement." Id. The "structure of the License agreement [therefore] [did] not suggest the parties intended the exclusive License to be equivalent to an assignment." Id. Based on these facts, the court dismissed LASCO's trademark infringement claims for lack of standing. Id. at *5.

This case falls somewhere between LASCO and Innovation Ventures.[5] Weighing in favor of standing, the license allows Elevate to use the ELEVATE Marks "in connection with providing addiction treatment and rehabilitation services for alcohol and substance-addicted individuals." ECF No. 5-4. This, for all practical purposes, is a license for the trademarks in their entirety, not for "only certain types of [services]." Lasco, 2014 WL 12601016, at *4. Also pointing toward standing is the fact that the agreement contains no clause "explicitly stating that the licensor retains title and ownership of the mark and all rights not expressly granted in the exclusive license." Id. On the other hand, Manson retains even greater control over the litigation than did the licensor in Innovation Ventures. There, as here, the agreement contained a provision requiring licensor approval of settlements that affect the trademarks. 2013 WL 1007666, at *6. But Manson's licensing agreement *also* requires his approval to "prosecute actions against infringers and defendant against infringement actions." ECF No. 5-4 (Section 3(b)). And while Elevate can decide affirmatively to bring litigation, it cannot decide that such litigation will not be brought; if it declines to bring suit, Manson may then do so. Id. These latter two provisions constitute more than just "a slice of control over litigation." 2013 WL 1007666, at *6. Finally, unlike in Innovation Ventures, Manson and Elevate did not enter into an assignment and license-back agreement, which the Lasco court found weighed against standing.

Nor does Spin Master, LTD v. Zobmondo Entertainment, LLC, No. CV 06-3459 ABC, 2011 U.S. Dist. LEXIS 94905 (C.D. Cal. Aug. 22, 2011), help Elevate's case. Elevate claims that in Spin Master, the licensor retained "sole discretion" over litigation decisions, and yet the court still found that the licensee had standing to enforce trademark rights. ECF No. 32 at 11 (quoting Spin Master, 2011 U.S. Dist. LEXIS 94905, at *22-23). Elevate gets its facts wrong. It was Spin Master, the *licensee,* who had "'sole discretion' to decide . . . whether to litigate, settle, or otherwise resolve the lawsuit." Spin Master, 2011 U.S. Dist. LEXIS 94905, at *22-23. By contrast here, Elevate had to obtain Manson's written approval for all litigation decisions, and

---

[5] As an initial matter, there is no dispute that the licensing agreement gives Manson control over the quality of the services associated with the ELEVATE Marks, but the Court agrees with the reasoning in Innovate Ventures that this fact is not particularly helpful. This type of supervision clause is a required feature of any valid trademark license. Innovation Ventures, 2013 WL 1007666, at *5.

7

Manson could decide to bring suit even when Elevate would not. Given the factual dissimilarities, the fact that standing existed in Spin Master in no way supports Elevate's standing argument here.

There is no question that the licensing agreement between Manson and Elevate grants Elevate an exclusive license to the ELEVATE Marks. ECF No. 5-4 (Section 1). Based on the text of the licensing agreement, however, the Court cannot conclude that it "grants to the exclusive licensee a property interest in the trademark, or rights that amount to those of an assignee." Innovation Ventures, 2013 U.S. Dist. LEXIS 34937, at *26 (quoting Visa, 2005 WL 6271242, at *3). Most importantly, Manson retains too much control over Elevate's litigation decisions through the licensing agreement's written approval requirement. If the agreement were the assignment and license-back variety, the Court might have concluded, like in Innovation Ventures, that sufficient factual disputes remained about standing to proceed to trial. But here, the Court concludes as a matter of law that Elevate lacks standing to bring trademark infringement claims over the ELEVATE Marks.[6]

### C. UCL Standing

Elevate also moves for a preliminary injunction based on a UCL violation. To the extent the UCL claim is predicated on its trademark infringement claim, that claim fails. Elevate separately argues, however, that Defendants violated the UCL by "offering recovery services without a license as required by under California law." ECF No. 5 at 17. But as Defendants point out, Elevate does not explain how that practice, even if true, has harmed Elevate separate and apart from the alleged trademark infringement. Without a showing of injury in fact, Elevate lacks standing to pursue its UCL claim as well. Hall v. Time Inc., 158 Cal. App. 4th 847, 854 (2008) (explaining that "a plaintiff suffers an injury in fact for purposes of standing under the UCL when he or she has: (1) expended money due to the defendant's acts of unfair competition; (2) lost money or property; or (3) been denied money to which he or she has a cognizable claim.") (internal citations omitted).

### CONCLUSION

The Court denies Elevate's motion for preliminary injunction. The Court dismisses

---

[6] The Court therefore does not reach the Defendants' alternative arguments.

8

Plaintiff's Lanham Act and UCL claims without prejudice for lack of standing based on the analysis above. Because Plaintiff recently filed a new case that appears to supersede this one, the Court dismisses the remainder of the case without prejudice also. See Case No. 3:17-cv-756.[7] The Court will administratively close the case if an amended complaint is not received by May 25, 2017.

IT IS SO ORDERED.

Dated: May 11, 2017



JON S. TIGAR
United States District Judge

---

[7] This includes Plaintiff's cybersquatting claim, even though that claim was not raised in the motion for preliminary injunction or addressed in this Order, because it is re-alleged in Plaintiff's second case.

9